**Brian HOUSE, Appellant,**

v.

**BJK INDUSTRIES; Robert L. Whittaker, Director of Special Fund; Hon. Donna H. Terry, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2002–SC–0429–WC.

Supreme Court of Kentucky.

April 24, 2003.

Charles Ched Jennings, Haydon Dockter & Jennings, Louisville, for Appellant.

W. Kenneth Nevitt, Nevitt & Williams, Louisville, for Appellee, BJK Industries.

John William Burrell, David W. Barr, Kentucky Labor Cabinet, Division of Special Fund, Frankfort, for Appellee, Special Fund.

## OPINION OF THE COURT

Having concluded that the claimant's post-award decrease in wage-earning capacity was due to economic factors rather than to the effects of his compensable injury, the Court of Appeals determined that he was not entitled to an increased award at reopening. Thus, it reversed a Workers' Compensation Board (Board) decision that had affirmed the increased award. We are persuaded, however, that the Administrative Law Judge (ALJ) reasonably concluded from the evidence that the effects of the claimant's injury were a substantial factor in causing his loss of earning capacity. Therefore, we reverse and reinstate the award.

The claimant was born in 1958, had a high school education, and no specialized or vocational training. From 1980 to 1993, he worked as a laborer and warehouse leadman. In 1993, he began working for the defendant-employer, the manufacturer of plastic film. He worked in quality control for approximately 40 hours per week, and he also worked overtime as a production worker for about 15 hours per week. The quality control position involved pulling on sheets of the material and performing various tests; whereas, production

work involved manually removing the product from the assembly line, weighing it, putting it in a crate, and placing it in a box.

In 1996, the claimant began to experience pain in his neck and left arm and was diagnosed with a significant disc herniation at C5–6 that resulted in nerve root compression. Dr. Villanueva surgically removed the disc in December, 1996, and attributed the claimant's condition to the repetitive nature of his work and to the arousal of pre-existing conditions. He assigned a 10–15% impairment rating and permanent restrictions that precluded lifting more than 50 pounds and lifting more than 25 pounds overhead. In contrast, Dr. Nehil assigned a 17% impairment rating but was not convinced that the condition was work-related. Although the claimant was able to return to the quality control position, his restrictions prevented him from working the overtime hours as a production employee, thereby causing his earnings to decrease.

In deciding the initial claim, an ALJ determined that the claimant sustained a work-related cervical spine injury due to the repetitive nature of his work and that the injury became disabling on November 19, 1996. Turning to the extent and duration of disability, the ALJ determined that in view of the claimant's relatively young age, successful surgery, return to the light duty quality control position, impairment, restrictions, and inability to earn his pre-injury wage, his occupational disability at the time was 20%. *Osborne v. Johnson,* Ky., 432 S.W.2d 800 (1968).

On July 19, 1999, the claimant moved to reopen the claim, alleging a change of occupational disability. He testified that, after returning to work, he began to experience pain and symptoms similar to those that he had experienced before the first surgery. Thus, in February, 1998, Dr. Villanueva performed a second surgery for

a herniated disc, this time at C6–7. After recovering, the claimant retained a 22% impairment but had no change in his restrictions. Although he retained the physical ability to return to light duty work such as quality control, his employer had eliminated his former position by including quality control in the duties of a production worker. Therefore, he was terminated because the requirements of production work exceeded his lifting restrictions. At the time of the hearing, he had found full-time work as a security officer at a local college, earning less than in his previous employment. He testified that he continued to have problems with numbness and tingling in his hands, took medication for pain and inflammation, had noticed a loss of strength in his hands, and found it difficult to grip objects.

Applying the principles of *Osborne v. Johnson, supra,* the ALJ who considered the reopened claim noted that the claimant was a high school graduate with a history of manual labor. He continued to have significant restrictions that precluded a return to many jobs involving manual labor, particularly those that required overhead work. Furthermore, after the second surgery, he experienced increased symptoms in his arms and hands. He remained unable to do production work, and because the jobs were reconfigured, he was unable to continue working in quality control. Although he found other work, it was at a substantially reduced pay rate. Thus, as later clarified in the order on reconsideration, the ALJ concluded that the claimant sustained an additional occupational disability of 40%.

The Board determined that the increased impairment and symptoms were sufficient to support a finding of increased occupational disability. Nonetheless, the Court of Appeals found no evidence that increased symptoms at reopening would prevent the claimant from doing any work

that he had been able to do at the time of the initial award. The court concluded, instead, that the decrease in wage-earning capacity that occurred between the initial award and reopening "was due to the economic circumstance of his job being changed, and his having taken a lower paying job," factors that were not caused by the work-related injury.

▪ Appealing, the claimant points out that it is the function of the ALJ to weigh the evidence and to translate evidence of a functional impairment into a finding of occupational disability. He maintains that, in rejecting the ALJ's findings, the Court of Appeals invaded the province of the fact-finder. Furthermore, he notes that one of the goals of the Workers' Compensation Act is to encourage employers to accommodate injured workers and, thereby, to enable them to return to work. He points out that when an employer does so, the initial award is likely to be less than what it would have been otherwise because it takes into account both the individual's ability to continue working and the post-injury earnings. He maintains, therefore, that such a worker has sustained an increased occupational disability if the employer later ceases the accommodation, terminates the worker, and the worker's subsequent employment pays a lower wage.

In *Osborne v. Johnson, supra* at 804, we equated occupational disability with a loss of earning capacity. Furthermore, we explained that where an injured worker returns to work, the extent of an existing occupational disability is reflected in the individual's post-injury wages. Until 1987, KRS 342.125(1) permitted reopening upon evidence of increased occupational disability due to a "change of condition," a term that was interpreted by the courts to require evidence of a change of physical condition rather than "a mere fluctuation in economic conditions." *See Continental*

*Air Filter Co. v. Blair,* Ky., 681 S.W.2d 427, 428 (1984); *Osborne v. Johnson, supra* at 804. Dissenting from the majority opinion in *Continental Air Filter Co. v. Blair, supra* at 428–29, Justice Leibson pointed out that interpreting the reopening statute to require a change of physical condition encouraged an employer to create a job within an injured worker's restrictions until an award was rendered but left a worker who suffered no subsequent physical change without recourse if the accommodation later ceased. *Gro–Green Chemical Co. v. Allen,* Ky.App., 746 S.W.2d 69 (1987), later established that a change of physical condition, by itself, was insufficient to support a finding of increased occupational disability.

▪ In 1987, KRS 342.125(1) was amended, and the phrase "change of condition" was replaced with "change of occupational disability." 1987 Ky. Acts (Ex.Sess.) ch. 1, § 16. As we explained in *Peabody Coal Co. v. Gossett,* Ky., 819 S.W.2d 33, 36 (1991), part of the rationale for the amendment was to address Justice Leibson's concerns in *Continental Air Filter Co. v. Blair, supra.* As a result of the 1987 amendment, the focus of inquiry at reopening became whether the effects of a work-related injury were a substantial factor in causing the worker's post-award loss of earning capacity.

▪ When the merits of the reopening were considered, the burden was on the claimant to show that he sustained a post-award increase in occupational disability due to the effects of his injury. In view of the fact that he prevailed before the ALJ, the standard of review was whether the finding in his favor was reasonable under the evidence. *Special Fund v. Francis,* Ky., 708 S.W.2d 641, 643 (1986). It is obvious that the employer was free to reorganize the duties of particular jobs, to eliminate the quality control job, and to terminate the claimant because

he could not do production work. Nonetheless, we are not persuaded that its decision to do so precluded the claimant from reopening his award if he established that: a.) his present earning capacity was less than it had been at the time of the initial award and b.) the effects of his injury were a substantial factor in causing the loss.

As the claimant points out, he returned to his quality control job after the injury, and the initial award took into account the extent to which his earning capacity had decreased at that time, as reflected in his pre- and post-injury wages. After working for a while, he underwent surgery at a different level of his spine, sustained an additional functional impairment, and experienced increased symptoms in his arms and hands. Specifically mentioned were a loss of strength in his hands and problems with gripping objects, symptoms that the ALJ could reasonably conclude would affect the extent of his ability to perform manual labor. He was terminated because the employer no longer had manual labor available that was within his restrictions. Furthermore, although he found other employment, it was at a lower wage. Under those circumstances, the ALJ reasonably concluded that he sustained a loss of earning capacity and that the effects of his injury were a substantial factor in causing that loss. In view of the claimant's history of manual labor, his post-award increase in impairment and in hand and arm symptoms, and the extent of his loss of earning capacity, the award of an additional 40% disability was reasonable.

The decision of the Court of Appeals is hereby reversed, and the claimant's award is reinstated.

All concur.